## NO. 23-1191

In The

# United States Court Of Appeals
## For The Fourth Circuit

**O.W., a minor, by his next friend and
parent Santrayia Bass,**

*Plaintiff – Appellant,*

v.

**MARIE L. CARR, police officer in her individual and official capcities;
REID BAKER, assistant principal in his individual and official capacities;
SCHOOL BOARD OF THE CITY OF VIRGINIA BEACH, VIRGINIA, a body corporate;
CITY OF VIRGINIA BEACH, a body politic and corporate; AARON C. SPENCE, Superintendent in
his individual and official capacities; DAN EDWARDS, school board members in their individual and
official capacities; CAROLYN T. RYE, school board members in their individual and
official capacities; KIMBERLY A. MELNYK, school board members in their individual and
official capacities; BEVERLY M. ANDERSON, school board members in their individual and
official capacities; SHARON R. FELTON, school board members in their individual and
official capacities; DOTTIE HOLTZ; LAURA K. HUGHES, school board members in their individual
and official capacities; VICTORIA MANNING, school board members in their individual and
official capacities; TRENACE B. RIGGS, school board members in their individual and
official capacities; JOEL MCDONALD, school board members in their individual and
official capacities; PATTI T. JENKINS, Principal in her individual and official capacities;
CAROLYN D. WEEMS, school board members in their individual and official capacities,**

*Defendants – Appellees,*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK**

————————

## BRIEF OF APPELLANT

————————

**Makiba Gaines, Esq.**
**Virginia State Bar No. 93983**
**POLARIS LAW FIRM, P.L.L.C.**
**2832 South Lynnhaven Road,**
**Suite 201**
**Virginia Beach, Virginia 23452**
**Phone: (757) 904-0370**
**Facsimile: (757) 866-5744**
**mg@legalhep757.com**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-1191</u>         Caption: <u>O.W. v. School Board of the City of Virginia Beach, et.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>O.W.</u>
(name of party/amicus)

_____

 who is <u>the Appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                          ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?               ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?               ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?               ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____02/27/2023_____

Counsel for: O.W._____

Print to PDF for Filing

# **TABLE OF CONTENTS**

**page**

DISCLOSURE STATEMENT

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE.............................................................................2

I.       Introduction.................................................................................2

II.      Statement of the Facts.................................................................3

         a.      The Criminal Investigative Practice .........................3

         b.      O.W.'s Criminal Investigation.................................7

         c.      VBCPS Regulation.................................................14

III.     Procedural History ....................................................................14

SUMMARY OF THE ARGUMENT ..................................................................15

STANDARD OF REVIEW ...............................................................................18

ARGUMENT ..................................................................................................19

A.       THE ASSISTANT PRINCIPAL'S SEARCH OF O.W.'S CELLULAR
         PHONE WAS UNREASONABLE ............................................................19

         1.      The school cellular phone search was unreasonable because it
                 was conducted under to the school's partnership agreement
                 with law enforcement and the information gathered for law
                 enforcement use ...............................................................20

2.    Even if the partnership between police and the school system to jointly investigate students did not invalidate application of the special needs doctrine, the school cellular phone search was unreasonable under *T.L.O. v. New Jersey* because it was not justified at the inception and the scope of the search is unknown ........................................................................... 27

B.    THE DISTRICT COURT ERRED IN HOLDING THAT O.W.'S CONFESSIONS WERE VOLUNTARY ........................................................ 31

C.    THE DISTRICT COURT ERRED IN HOLDING THAT O.W. FAILED TO PROVIDE EVIDENCE THAT THE DEFENDANTS ACTED JOINTLY IN CONCERT FOR THE § 1983 CONSPIRACY CLAIM ........................................................................................................... 35

D.    THE DISTRICT COURT ERRED IN HOLDING THAT O.W. FAILED TO ESTABLISH HIS CLAIMS UNDER MONELL ..................... 37

E.    THE DISTRICT COURT ERRED IN HOLDING THAT THE SCHOOL BOARD DID NOT VIOLATE O.W.'S RIGHT TO DUE PROCESS BY PROMULGATING AND FAILING TO ENFORCE A REGULATION THAT REQUIRED IT TO PROTECT HIS CONSTITUTIONAL RIGHTS .................................................... 38

F.    THE DISTRICT COURT ERRED IN TAKING JUDICIAL NOTICE OF UNAUTHENTICATED, NON-PUBLIC RECORDS ............................ 41

G.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING APPELLANT LEAVE TO AMEND HIS PLEADING AND FOR LIMITING THE EXTENT TO WHICH HE MAY SEEK LEAVE TO AMEND .................................................... 42

H.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT "WITH PREJUDICE." ............................................. 44

CONCLUSION ....................................................................................... 45

REQUEST FOR ORAL ARGUMENT ................................................. 45

CERTIFICATE OF COMPLIANCE ..................................................... 46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adbul-Mumit v. Alexandria Hyundai, LLC*,
   896 F.3d 278 (4th Cir. 2018) ..........................................................42

*Anderson v. Liberty Lobby, Inc*.,
   477 U.S. 242, 106 S. Ct. 2505 (1986) ...........................................19

*Andes v. Vesant Corp*.,
   788 F.2d 1033 (4th Cir. 1986) .......................................................45

*Bd. of Educ. v. Earls*,
   536 U.S. 822 (2002)........................................................................27

*Bd. of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972)........................................................................40

*Chambers v. Florida*,
   309 U.S. 227, 60 S. Ct. 472 (1940) ...............................................33

*Commonwealth v. Gatewood*,
   No. 1420-12-1, 2013 Va. App. LEXIS 27
   (Ct. App. Jan. 22, 2013)..................................................................33

*Couch v. United States*,
   409 U.S. 322, 93 S. Ct. 611 (1973) ...............................................32

*Deshaney v. Winnebago Cty. Dep't of Soc. Servs*.,
   489 U.S. 189 (1989)..........................................................38, 39, 40, 41

*Direct Sales Co. v. United States*,
   319 U.S. 703, 63 S. Ct. 1265 (1943) .............................................37

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .........................................................42

*Ferguson v. City of Charleston*,
   532 U.S. 67, 121 S. Ct. 1281 (2001) .....................................*passim*

*Florence v. Bd. of Chosen Freeholders*,
    566 U.S. 318, 132 S. Ct. 1510 (2012) ..........................................29

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987)......................................................................27

*Hafner v. Brown*,
    983 F.2d 570 (4th Cir. 1992) ........................................................36

*Haley v. Ohio*,
    332 U.S. 596, 68 S. Ct. 302 (1948) ..............................................32

*Hart v. Hanover Cty. Sch. Bd.*,
    495 F. App'x 314 (4th Cir. 2012).................................................42

*Hinkle v. City of Clarksburg*,
    81 F.3d 416 (4th Cir. 1996) ....................................................35, 36

*Hutto v. Ross*,
    429 U.S. 28, 97 S. Ct. 202 (1976) ................................................31

*J.D. ex rel. Doherty v. Colonial Williamsburg Found.*,
    925 F.3d 663 (4th Cir. 2019) ........................................................18

*J. D. B. v. North Carolina*,
    564 U.S. 261, 131 S. Ct. 2394 (2011) .............................................4

*Johnson v. United States*,
    228 U.S. 457, 33 S. Ct. 572 (1913) ..............................................32

*Katz v. United States*,
    389 U.S. 347 (1967)......................................................................19

*Knibbs v. Momphard*,
    30 F.4th 200 (4th Cir. 2022) ........................................................19

*Laird v. Fairfax Cty.*,
    978 F.3d 887 (4th Cir. 2020) ........................................................18

*Lyons v. Oklahoma*,
    322 U.S. 596, 64 S. Ct. 1208 (1944) ............................................32

iv

*Maine v. Moulton*,
474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985) ................................33

*Massiah v. United States*,
377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) ...............................33

*Miller v. Md. Dep't of Nat. Res.*,
813 F. App'x 869 (4th Cir. 2020)....................................................................42

*Miranda v. Arizona*,
384 U.S. 436, 86 S. Ct. 1602 (1966) ...............................................4, 5, 12, 22

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658, 98 S. Ct. 2018 (1978) .........................................................1, 37

*Nat'l Treasury Employees Union v. Von Raab*,
489 U.S. 656 (1989).......................................................................................27

*New Jersey v. T.L.O.*,
469 U.S. 325, 105 S. Ct. 733 (1985) ........................................................*passim*

*O'Connor v. Ortega*,
480 U.S. 709 (1987).......................................................................................27

*Pinder v. Johnson*,
54 F.3d 1169 (4th Cir. 1995) .........................................................................39

*Powers v. Dole*,
782 F.2d 689 (7th Cir. 1986) .........................................................................41

*Riley v. California*,
573 U.S. 373, 134 S. Ct. 2473 (2014) .....................................................29, 31

*Safford Unified Sch. Dist. #1 v. Redding*,
557 U.S. 364, 129 S. Ct. 2633 (2009) .....................................................28, 29

*Schneckloth v. Bustamonte*,
412 U.S. 218, 93 S. Ct. 2041 (1973) .............................................................34

*Skinner v. Ry. Labor Executives' Ass'n*,
489 U.S. 602, 109 S. Ct. 1402 (1989) ...........................................................25

*Thompson v. Louisiana*,
    469 U.S. 17, 105 S. Ct. 409 (1984) ...............................................19

*Ullmann v. United States*,
    350 U.S. 422, 76 S. Ct. 497 (1956) ...............................................32

*United States v. Braxton*,
    112 F.3d 777 (4th Cir. 1997) .........................................................31

*United States v. Burr*,
    25 F. Cas. 38 (1807) .....................................................................32

*United States v. Curry*,
    965 F.3d 313 (4th Cir. 2020) .........................................................25

*United States v. Goodson*,
    204 F.3d 508 (4th Cir. 2000) ................................................... 44-45

*United States v. Knights*,
    534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001) ..............19

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976) ......................................................................27

*Vernonia Sch. Dist. v. Acton*,
    515 U.S. 646 (1995) ......................................................................27

*Wright v. Swain*,
    168 Va. 315, 191 S.E. 611 (1937) ................................................39

## Statutes

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1367 ..................................................................................1

42 U.S.C. § 1983 .............................................................1, 17, 35, 36

Va. Code § 16.1-260 .........................................................................13

Va. Code § 16.1-305 ...................................................................41

Va. Code § 18.2-374.1:1 .............................................................29

Va. Code § 22.1-79 .....................................................................38

**Constitutional Provisions**

U.S. Const. amend. IV ............................................................*passim*

U.S. Const. amend. V......................................................1, 32, 33

U.S. Const. amend. VI ........................................................... 33

U.S. Const. amend. XIV ........................................................*passim*

**Regulations**

School Board Regulation 5-64.1...............................................38

**Rules**

Fed. R. Civ. P. 15(a)..................................................................42

Fed. R. Civ. P. 15(a)(2).............................................................42

Fed. R. Civ. P. 56 .....................................................................45

Fed. R. Civ. P. 56(a).................................................................18

Fed R. Evid. 201 .......................................................................41

**Other Authorities**

Gabriella Souza,
*Racial Disparities Get Beach Schools Chief's Attention*,
        THE VIRGINIAN-PILOT (February 19, 2015), available at
        https://www.pilotonline.com/news/education/article_984bf825-
        eb58-5c0da46a-eaadc7bed25d.html ...........................................26

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because the lawsuit was filed to vindicate rights guaranteed to Appellant under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The district court had supplemental jurisdiction over Appellant's state law claim under 28 U.S.C. § 1367. The district court entered a final judgment denying Appellant's motion for partial summary judgment and granting Appellees' motions for summary judgment on February 14, 2023. JA1234-1235. Plaintiff filed a notice of appeal on February 17, 2023. JA1236. Under 28 U.S.C. § 1291, this Court has appellate jurisdiction over the final judgment which disposed of all Appellant's claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether, under the Fourth Amendment, a school official's warrantless search of the digital contents of a student's cellular phone was reasonable?

2. Whether the district court erred in resolving factual disputes in the moving parties' favor and holding that Appellant's confessions were voluntary under the Fifth and Fourteenth Amendments to the United States Constitution?

3. Whether the district court erred in holding that Appellant failed to provide evidence that the Appellees acted jointly in concert for Appellant's § 1983 Conspiracy claim?

4. Whether the district court erred in finding that Appellant failed to provide evidence that the government bodies were liable for their policies, practices, and customs under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 664, 98 S. Ct. 2018, 2022 (1978)?

5. Whether, under the Fourteenth Amendment, a government body establishes a duty and a special relationship with a group, or creates an entitlement deserving of Due Process protection, by promulgating a regulation that requires it to protect?

6. Whether the district court erred in taking judicial notice of an unauthenticated, non-public record?

7. Whether the trial court abused its discretion in denying Appellant's motion for leave to amend and limiting the extent to which Appellant is permitted to seek leave to amend?

8. Whether the district court abused its discretion in denying Appellant's motion for partial summary judgment "with prejudice"?

## **STATEMENT OF THE CASE**

### I.     **Introduction**

This lawsuit challenges the practices of Virginia Beach Police Department ("VBPD")[1] and Virginia Beach City Public Schools ("VBCPS")[2] of collaborating to detain, search, and interrogate students — to coerce their criminal confessions and gather bullet-proof evidence from them for arrests and prosecutions.

This long-held joint investigative practice is especially harmful to the classes of students who are more likely to enter the school system's disciplinary process and

---

[1]  The VBPD is a department of the City of Virginia Beach, Virginia. The City of Virginia Beach and Marie Carr shall hereinafter, collectively, be referred to as the "City Appellees."

[2]  VBCPS is operated by the School Board of the City of Virginia Beach, Virginia. All school board members and employees of the School Board shall hereinafter, collectively, be referred to as the "School Appellees."

2

to be arrested on school grounds. VBCPS and VBPD have no safeguards in place to prevent school administrators and police officers from applying the search program and coercive criminal investigative method discriminately between students of different races, abilities, and socio-economic backgrounds. Rather, school officials and police officers have unfettered discretion to choose which students will leave school grounds with so much evidence against them that it almost guarantees them a pass to a correctional institution.

Appellant O.W. is not challenging the constitutionality of the SRO partnership program itself; he *is* challenging the criminal detentions, searches, and coercive criminal interrogations being performed by school authorities in furtherance of the partnership. What differentiates this case from all other cases involving criminal investigations on school grounds is that this case does not involve inadvertent disclosures of criminal evidence to law enforcement. Instead, it involves a policy designed by law enforcement to gather criminal evidence from students when they are most vulnerable — in a special needs setting — and unable to access their parents, attorneys, and friends for advice.

## II.     Statement of the Facts

### a. The Criminal Investigative Practice

The VBCPS and the VBPD operate under a written SRO partnership agreement [hereinafter referred to as the "partnership agreement" or the

"memorandum of understanding"] to achieve law enforcement's objective of controlling crime inside VBCPS. JA371-378. Under the partnership agreement, SROs are "responsible for law enforcement activities that occur on the school campus," JA371, and are not "responsible for enforcement of violations of school rules, regulations or administrative rules," JA372. School employees immediately alert SROs to suspected student criminality at the beginning of every criminal investigation. JA373 (MOU, at (iv)(B); JA482 (Dep. Tr. of Marie Carr, at 14:13-17); JA601 (admission no. 15).

Despite the presence of a police officer at the beginning of every criminal investigation, SROs and school authorities engage in what the police department refers to as "parallel investigations" where school authorities lead in interrogating and searching students while police officers contemporaneously gather criminal evidence for criminal arrests and prosecutions. JA601 (admission no. 15); JA541-542 (Dep. Tr. of Reid Baker, vol. ii, at 78:24-25, 79:1-3); JA566-569 (Dep. Tr. of Sergeant Luis Cortes); JA709 (stating "normally if there was a criminal investigation, [Carr] will sit in."); JA985 (Dep. Tr. of Marie Carr, at 15:1-19); JA482 (Dep. Tr. of Marie Carr).

Instead of the script read by police officers under *Miranda v. Arizona*, 384 U.S. 436, 447, 86 S. Ct. 1602, 1614 (1966); *see also J. D. B. v. North Carolina*, 564 U.S. 261, 297, 131 S. Ct. 2394, 2418 (2011), students are only warned about the

additional punishment they may face for refusing to confess to their crimes, JA551
(Dep. Tr. of Reid Baker, at 95:14-20); JA578-579 (Dep. Tr. of A.F.); JA704 (Carr
administered the *Miranda* warning to O.W. at 6:10 p.m.) — "part of [VBCPS'] script
is like if we're talking with students and if they're not telling us the truth, there's
another violation against the Code of Student Conduct where it could be like your
(sic) not telling us the truth is another violation." JA594 (Dep. Tr. of Reid Baker).

> Q: "When you say "our script," are you referring to a school policy for
> administrators about how to interview students?
>
> A. Yeah. Virginia Beach policy on like how to help kind of just go
> along with our investigation process. Yeah. With Virginia Beach
> schools. Yes.

JA594.

School officials require students to write confessions regarding their own
suspected criminal conduct, they then deliver those written confessions to SROs,
outside the judicial process, for criminal evidentiary purposes. JA560-566, JA510-
512.

> Q.· Okay. Have you ever -- has one of your officers ever described this
> statement to you?
>
> A.· Yes. Yes. I know usually when -- what I was just stating, usually
> when something happens at the school and a child is involved, then they
> have to write an incident statement as to what occurred.
>
> Q.· Okay. That the student has to write?

A.· That the student has to write in their own words. And I have seen one before, because I have seen one where a child wrote one. He wrote it out. But not this one in particular.

Q.· Okay. Do you know who requires the student to make a statement on this document?

A.· I believe it's the – I'm not a hundred percent sure, but I think the principal or whoever is doing the administrative investigation at the school has them fill this out.

JA564-565 (Dep. Tr. of Sergeant Luis Cortes).

Q.· Do you know what your officers would have been using this statement for?

A.· In order to figure out if we had probable cause in order to make a criminal complaint against the student, you would have to have a basis. They have to have probable cause before they will bring a charge against a student.

JA566.

The school system shares these records with SROs outside the judicial process

for criminal evidentiary purposes.

Q. Could you tell me the process of one of your -- one of your direct reports should have taken if they wanted to get one of these statements from the school?

A.· They would have to speak with the – in my opinion, they would have to speak with the ·principal in order to get a copy of this.

JA564-565.

For the last twenty years, throughout at least the thirty-two schools Sergeant

Luis Cortes supervised, school authorities have been responsible for giving police

officers all the criminal evidence they needed to arrest and prosecute students for criminal conduct that occurred on school grounds. JA570.

> Q.· So when you say that the principal generally has everything that the SRO needs –
>
> A.· Uh-huh.
>
> Q.· -- how long has that been the -- been the case?
>
> . . . .
>
> THE WITNESS: I think that is how it's always been.

JA568-569.

The partnership agreement also established methods of student searches and seizures, arrests, and evidence collection. JA374-375. The agreement provided little to no information about how it advanced any of the school system's goals related to discipline and order.

### b.  O.W.'s Criminal Investigation

An older female student was said to have voluntarily "sexted" then-thirteen-year-old O.W. a nude picture of herself on or around December 2018 or January 2019. JA573. Other students started to gossip about the photograph and asked O.W. whether "A.F. had really sent it to him." JA1020, JA1026. On March 5, 2019. O.W. was believed to have displayed the photograph to other students at the lunchroom table and in care class and to have forwarded the photograph to then-twelve-year-old G.C., a white male student, upon G.C.'s request. JA701.

A student reported to a teacher that the female student "texted pictures of her 'parts' to [O.W.] and he ha[d] them on his phone." JA746. The teacher brought the information she received to the attention of acting Assistant Principal Reid Baker ("Mr. Baker" or "Baker"). JA1305. Baker *first* reported the incident to SRO Marie Carr ("Officer Carr") and told her that he was "calling down students regarding possible child pornography," JA701, 986 (Dep. Tr. of Marie Carr, at 17:8-11). Baker alerted Officer Carr despite having four security guards on staff. JA504 (Dep. Tr. of Marie Carr, at 53:1-20). Mr. Baker testified that he did not know which, if any, school rule O.W.'s conduct might have violated at that time. JA950 (Dep. Tr. of Reid Baker, at 16:4-12).

Around "two something" (between 2:00 p.m. and 3:00 p.m.), Baker detained O.W. and led him to a guidance office to complete the investigation. JA701, JA1296. The guidance office was about 72 square feet and located inside a larger guidance department, JA949 (Dep. Tr. of Reid baker, at 11:13-19), 989) (Dep. Tr. of Marie Carr, at 26:13-17), where a secretary sat. O.W. sat at the opposite side of Mr. Baker's desk, and Carr sat or stood nearest the door. JA1322 (Dep. Tr. of Reid Baker, at 42:1-8). On the way to the guidance office, Baker stopped inside the printing room, briefly questioned O.W., and warned him against being untruthful during the investigation. JA1021. Mr. Baker then directed O.W. to write out his first statement about his suspected criminal conduct. JA1022. O.W. did not give enough inculpatory

facts in his first statement, so Baker threw that one away and directed O.W. to write a better one. JA587 (Dep. Tr. of O.W., at 32:20-23). O.W. testified that he did not recall the exact contents of his first statement. JA587. But he did recall admitting that he showed other students "the photo." O.W. had not given any details about the contents of the photograph at that time and nor had he confessed the identity of the person who created and sent the photograph to him. JA747.

Officer Carr was waiting inside the guidance office for O.W. and Mr. Baker to arrive[3]; she exited the guidance office with Mr. Baker and returned shortly thereafter asking O.W. for his identifying information. JA1024 (Dep. Tr. of O.W., at 42:14-19). Officer Carr testified that she was inside the office with O.W. and Mr. Baker to investigate O.W.'s suspected criminal conduct. JA860 (Dep. Tr. of Marie Carr, at 30:3-11).

Baker and Carr questioned O.W. together, [4] JA1024, JA537. Baker initiated the questions to O.W. questions, and Officer Carr asked O.W. questions to clarify

---

[3] The district court resolved this disputed fact in the Appellees' favor. Citing the City Appellees' statement of undisputed facts, the court said, "Baker began his interview of O.W. before Carr arrived in the room off the guidance office," JA334. Appellant disputed this fact by stating, "Carr immediately asked Plaintiff for his and his parents' identifying information when he walked into the room." JA718-719. Assuming the district court intended to reference only the events that occurred inside the printing room, Appellant agrees that Baker first started to interrogate O.W. inside the printing room, when Officer Carr was not present.

[4] Citing ¶ 26 of Plaintiff's Second Amended Complaint, which reads, "BAKER began to interrogate Plaintiff inside the guidance office while CARR conducted her investigation contemporaneously (and at that point silently) from the corner of the

the responses he had given to Mr. Baker about his suspected criminal conduct. JA707 (City of Virginia Beach, Admin. Investigation).

O.W. initially denied having the photograph. "Baker told [O.W.] what he was telling him just did not make sense." JA 701, JA976 (Dep. Tr. of Reid Baker, at 64:11-21). "Mr. Baker asked what happened during lunch. [O.W.] stated nothing happened during lunch." JA701. Mr. Baker confronted O.W. with some of the evidence he already had against him. JA701, JA894 (Dep. Tr. of Reid Baker, at 68:12-21), JA 976. O.W. "told Mr. Baker that [G.C.] was one of the students who saw the photo, asked to use his iPhone to call someone, and then sent the photo to himself without permission." JA701. "Mr. Baker asked for his phone, and asked if he still had the inappropriate photo on the phone. [O.W.] stated he deleted the photo." JA701. Mr. Baker testified that he likely told O.W.:

> I need you to write a statement. I need you to tell me everything of what was going on revolving [sic] this. Write a statement. Read the statement. Kind of like, So this is what you wrote. Are you telling me the truth. Is this where it happened? If I'm doing a follow-up after

---

same room," and the City Appellees' statement of undisputed facts, which said that "During Baker's interview with O.W. in the school counseling office, the door to office was kept open and Carr was also physically present in the room but did not ask any questions of O.W.," JA1333, the court concluded that, "Officer Carr did not ask O.W. any questions at this point." A single allegation that Carr was silent at the beginning of the investigation does not support the inference that she was silent the entire time or before "O.W. then admitted that he still possessed the photograph on his phone and that he sent it to another student." This factual conclusion is unsupported by the evidentiary record. For this reason, Appellant disputed this fact on the record by explaining that, "At a minimum, Carr chimed in during Baker's questioning of Plaintiff to obtain more incriminating responses from Plaintiff." JA718.

talking with other students, like I'm getting a different version of the story, Are you telling me the truth? Like if you're not telling me the truth, you know, there's a violation against the Student Code of Conduct where if you're not telling me the truth, that can be something else. So I need you to be honest with me, please tell me what was going on.

JA974-975.

At some point, Officer Carr told O.W., "Even if you deleted something, we can still find the image on your phone." JA708.

O.W. ultimately confessed that he possessed the photograph, that it was a nude image of the female student, and that he forwarded it to the other student upon that student's request. JA701.

Mr. Baker confiscated and searched the digital contents of O.W.'s cellular phone.[5] JA1027 (Dep. Tr. of O.W., at 47:10-22). Officer Carr immediately directed Mr. Baker to place O.W.'s phone in airplane mode, to power it down, and to hand it to her. JA492. Baker complied, and Officer Carr "collected [O.W.'s] iPhone as evidence." JA492, JA1253. Mr. Baker then directed O.W. to write another statement about his suspected criminal conduct. JA555-556, JA1019 (Dep. Tr. of O.W. at 37:20-38:1). Baker required O.W. to write two or

---

[5] O.W. pled in his Second Amended Complaint that Mr. Baker "searched the photo gallery of the phone and did not find the photograph." He did not plead that Baker *only* searched the photo gallery. O.W. testified, "And he was like -- he - he searched my phone because I -- I didn't have the photo in there at the time." JA1027. The scope of this cellular phone search is not shown on the record.

three statements that day. JA555-556, JA1022 (Dep. Tr. of O.W., at 12-14). Baker and Officer Carr left the room together while O.W. wrote his second or third confession. JA492.

Baker held O.W. after school hours to complete the investigation, JA551 (Dep. Tr. at 95:3-10) after Officer Carr informed him that she was not doing a "paper arrest," and that O.W. was not allowed to ride the bus home as he normally did. JA509 (Dep. of Marie Carr, at 58:7-23), JA995 (Dep. Tr. of Marie Carr, at 56:12-23), JA1351 (Dep. Tr. of Reid Baker, at 40:8-15). Shortly thereafter, Officer Carr went back into the room with O.W. when he was alone, handed his phone back to him, and asked him to show her the photograph inside the phone. JA990-991. Carr felt that she needed to see the photograph herself before she could charge O.W. with a felony. JA1246. Officer Carr was in uniform, wearing a gun, and displaying her badge of authority. JA600 (admission no. 4). O.W. was scared and did not believe he could stop her from searching his phone. JA747. Then-thirteen-year-old O.W. complied, and Carr found the photograph inside the phone's text messages. JA707, JA1264.

Officer Carr finally administered the *Miranda* warning to O.W. at 6:10 p.m. and arrested him on charges of possession and distribution of child pornography. JA701-702. O.W. was not allowed to have his mother, an attorney, or anyone else to aid him during his in-school detention and interrogation. *See generally* JA701-702.

12

Mr. Baker gave O.W.'s written statements to Officer Carr to be used as criminal evidence against O.W. JA512, JA550, JA600, JA602.

The next day, on March 6, 2019, Baker continued to gather evidence against O.W.  Baker obtained statements from at least six other students against O.W. JA510-511.  Other school employees delivered those statements to Officer Carr — again outside the judicial process — to be used in support of O.W.'s arrest and prosecution. JA510-512, JA600, JA602.

Officer Carr initiated charges[6] of possession and distribution of child pornography against O.W. (JA1368, JA1370), and Baker initially recommended O.W. for expulsion from school. JA1501. O.W. was kept in juvenile detention overnight. JA1485. The photograph and the confessions were all introduced against O.W. in his trial.[7]

---

[6]  The district court found that, "Following the incident, *the state* brought criminal charges of possession and distribution of child pornography against O.W. in the Juvenile and Domestic Relations Court. CSUF ¶ 36." The City Appellees said in ¶ 36 of their statement of facts that, "The criminal charges against O.W. proceeded in the VBJDR Court." Appellant disputes the district court's presentation of this fact to the extent that it suggests the prosecutor initiated charges against O.W. The record shows that the charges against O.W. were initiated by Officer Carr on March 5, 2019 at intake. JA1368-1369; See Va. Code § 16.1-260.

[7]  The City Appellees initially admitted this fact in their responsive pleading. In its final order, the district court granted the City Appellees leave to amend their pleading to withdraw this admission, after the close of discovery.

*c. VBCPS Regulation*

VBCPS promulgated a school regulation which provides, in pertinent portion, "The School Board shall protect the constitutional rights of minor students entrusted to its care until such time as the parents or legal guardian(s) can be contacted. . . ." V.B. SB. Reg. 5-64.1.

## III.   Procedural History

Appellant O.W.'s mother, Santrayia Bass, originally filed this action pro se in the United States District Court for the Eastern District of Virginia, Richmond Division, on March 5, 2021. (ECF No. 1). On April 12, 2021, the School Appellees filed a motion to dismiss and in the alternative to transfer venue (ECF No. 8), and the City Appellees filed a motion to dismiss Appellants claims (ECF No. 4). The court transferred venue to the Norfolk Division on August 2, 2021 (ECF No. 26) but withheld resolution of the pending motions to dismiss. On December 17, 2021, the district court entered its memorandum order on the Appellees' motion to dismiss and held that O.W.'s mother, a non-attorney, was not competent to litigate O.W.'s claims in federal court but granted her leave of Court to amend her pleading. (ECF No. 28). Having retained counsel, Appellant filed his First Amended Complaint on January 14, 2022. (ECF No. 30). Appellees filed motions to dismiss O.W.'s claims again on February 8, 2022 (ECF Nos. 39, 41), to which Appellant filed his responses on February 22, 2022 (ECF Nos. 45, 46). Appellees all filed their answers on March 28, 2022 (ECF No. 68, 69).

14

Following the close of discovery on August 2, 2022, the City Appellees and School Appellees filed separate motions for summary judgment. (ECF No. 115, 117). The district court reassigned the case to Judge Elizabeth W. Hanes on August 15, 2022. Appellant filed a cross motion for partial summary judgment on August 17, 2022. (ECF No. 122). Appellees and Appellant agreed to stay proceedings to allow the district court time to decide the numerous outstanding motions and to allow Officer Carr to be heard on her claim of qualified immunity before proceeding to trial.  (ECF No. 146).

The district court ruled on all the outstanding motions on February 14, 2023, wherein it denied O.W.'s motion for partial summary judgment with prejudice and granted the City and School Appellees' motions for summary judgment. JA1234-1235. The district court denied with prejudice O.W.'s motion to strike confidential records from the docket and took judicial notice of the facts contained therein, the court then determined that the noticed facts had no bearing on the outcome of this case. The district court denied O.W.'s motion for leave to file a third amended complaint without prejudice but gave him thirty days to file a limited motion for leave to file an amended pleading.

## SUMMARY OF THE ARGUMENT

O.W. has provided extensive evidence that his school authorities worked jointly in concert with law enforcement to criminally investigate him, search his

cellular phone, and to coerce his criminal confession. At a minimum, this evidence is more than enough to establish a genuine dispute of material fact on most, if not all his claims. The district court erred by failing to credit O.W.'s evidence as true, by repeatedly drawing inferences in the Appellees' favor and shifting burdens on Appellant who opposed the motions for summary judgment.

Having imposed the heightened burden on O.W., the district court resolved issues of fact against him including that O.W.'s confessions were voluntary. JA1221 n.20 ("While the Court concludes that O.W.'s statements were voluntary, it does not condone the investigatory techniques practiced by the City and the School Board.").

Appellees violated O.W.'s Fourth Amendment right be free from unreasonable searches when both Assistant Principal Reid Baker and Officer Marie Carr searched the digital contents of his cellular phone to gather evidence intended for use in O.W.'s prosecution. The Supreme Court has clearly explained the difference between an administrative search that just so happens to turn up evidence of criminality and one conducted for that law enforcement purpose. *Ferguson*, 532 U.S. at 88, 121 S. Ct. at 1294 (The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." (Kennedy, J., concurring in the judgment).  For this reason, the district court was wrong when it applied the rule applicable only to special needs cases to

16

determine the constitutionality of the search that was conducted for law enforcement purposes.

The Appellees violated O.W.'s rights under the Fifth Amendment's self-incrimination clause and Fourteenth Amendment's Due Process Clause by interrogating him together in a small office and requiring him to write a criminal confession for use in his prosecution. The district court erroneously resolved facts in the Appellees' favor by finding O.W.'s confessions were not coerced.

The school authorities also deprived O.W. of due process by failing to protect his constitutional rights against law enforcement questioning in the school setting because the school's regulation created a duty for it to do so, and the regulation also established an entitlement deserving of due process protection. The district court erred when it held that the school regulation did not create a duty for school authorities and failed to answer the question regarding Appellant's substantive entitlement claim.

The district court appears to have added an element of "conspiratorial intent" to Appellant's prima facie § 1983 conspiracy claim. The record is replete with evidence that Appellees acted jointly in concert in the acts that deprived O.W. of his rights, and the district court reached the wrong conclusion on this count when it held that Appellant failed to come forward with more proof of conspiratorial intent. The district court also erred when it refused to decide the underlying constitutional claims.

The district court held that it had subject matter jurisdiction under the *Rooker-Feldman* doctrine and that Appellant's claims were not barred under state law rules of collateral estoppel. These matters were resolved by reference to black letter rules of law, and any confidential juvenile court records were not admissible and the noticed facts not preclusive in this case. The district court again erred when it judicially noticed unauthenticated state court records – only to decide that the records had no impact on the outcome of this case.

The district court erred when it limited the extent to which Appellant may seek leave to file an amended complaint and for its prejudice ruling in denying Appellant's motion for partial summary judgment.

## STANDARD OF REVIEW

On appeal, this Court reviews "de novo the district court's summary judgment award." *J.D. ex rel. Doherty v. Colonial Williamsburg Found*., 925 F.3d 663, 669 (4th Cir. 2019). The Court will only "grant a movant's summary judgment motion when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a); 925 F.3d at 669. In applying this standard, the Court must view the evidence in the light most favorable to O.W., the non-moving party, and draw all reasonable inferences in his favor. *See Laird v. Fairfax Cty*., 978 F.3d 887, 892 (4th Cir. 2020). "That means that '[the Court] may not credit [Appellees'] evidence, weigh the evidence, or resolve factual disputes

in . . . [Appellees'] favor*." Knibbs v. Momphard*, 30 F.4th 200, 207 (4th Cir. 2022) (alterations in original). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## ARGUMENT

A.  THE ASSISTANT PRINCIPAL'S SEARCH OF O.W.'S CELLULAR PHONE WAS UNREASONABLE.

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. Fully, it provides that,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment —subject only to a few specifically established and well delineated exceptions." *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 105 S. Ct. 409, 410 (1984) (emphasis in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Court must "examin[e] the totality of the circumstances" to determine whether a search is reasonable within the meaning of the Fourth Amendment. *United States v. Knights*, 534 U.S. 112, 122, n 6, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001) (internal quotation marks omitted).

    *1. The school cellular phone search was unreasonable because it was conducted pursuant to the school's partnership agreement with law enforcement and the information gathered for law enforcement use.*

In *New Jersey v. T.L.O.*, 469 U.S. 325, 339, 105 S. Ct. 733, 742 (1985), the Supreme Court articulated the standard upon which a public-school official may search a student's person or property for administrative purposes. In so doing, the Court reasoned that the need for school authorities to maintain school order and discipline[8] are in the category of "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." The Court therefore held that "the legality of a search of a student [for disciplinary purposes] should depend simply on the reasonableness, under all the circumstances, of the search." *T.L.O.*, 469 U.S. at 341, 105 S. Ct. 733 at 742.

Undoubtedly focused on curtailing opportunistic abuse by law enforcement agencies, the Court took special care to limit its holding in *T.L.O.* to "searches carried out by school authorities *acting alone and on their own authority*." *Id.* at 341 n.7, 105 S. Ct. at 743 (emphasis added). In a bold caution to special needs programs

---

    [8] *Id*. at 469 U.S. at 340, 105 S. Ct. at 742 ("[R]equiring a warrant would impede the 'swift and *informal disciplinary procedures* needed in the schools'"); *id*. ("[E]vents calling for *discipline* are frequent occurrences and sometimes require immediate, effective action."); *id*. ("Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining *discipline* in the classroom and on school grounds.") (emphasis added)).

and law enforcement agencies, the Court explained that, <u>"This case does not present</u> <u>the question of the appropriate standard for assessing the legality of searches</u> <u>conducted by school officials in conjunction with or at the behest of law enforcement</u> <u>agencies, and we express no opinion on that question."</u> *Id.* (emphasis added). The district court therefore erred when it ignored this clear instruction and still applied *T.L.O.* to test the legality of the search at issue, which was conducted under the terms of the school's partnership agreement with police, and in furtherance of the police department's crime control objectives.

In *Ferguson v. City of Charleston*, 532 U.S. 67, 88, 121 S. Ct. 1281, 1294 (2001), the Supreme Court held that a government hospital's search program was unlawful where it, acting under the terms of a partnership agreement with the police department, gathered evidence from patients for law enforcement purposes.[9]

---

[9] There, the district court rejected the defense that the searches had "special non-law enforcement purposes," *id.* 532 U.S. at 73, because the police had far too much involvement in the program, *id.* at 74. The district court submitted the factual question of consent to the jury and required a verdict for Plaintiff unless the jury found the plaintiffs consented. *Id.* Plaintiffs ultimately lost on all counts and appealed to this Court assigning error to the district court's judgment, in part, on the basis that the district court erred when it submitted the consent issue to the jury. This Court passed on the question because it held that, even if plaintiffs did not consent, the search was reasonable under the special needs exception[9] to the warrant and probable cause requirement. The majority of this Court's appeals panel concentrated on the public health need associated with maternal cocaine use. The panel then balanced the effectiveness of the search policy and public policy interests against the intrusiveness of the search. This Court held the search policy reasonable under the Fourth Amendment. The Supreme Court granted certiorari but limited review to this

Another admonition to special needs programs, the Supreme Court warned that while government actors "may have a duty to provide the police with evidence of criminal conduct that they *inadvertently* acquire in [scope of their employment], when they undertake to obtain such evidence from [persons] *for the specific purpose of incriminating [them]*, they have a special obligation to make sure that the [subjects] are fully informed about their constitutional rights, as standards of knowing waiver require." *Id.* at 69, 121 S. Ct. at 1284 (citing *Miranda*, 384 U.S. 436, 447, 86 S. Ct. 1602)).

Distinguishing *T.L.O.* and other special needs cases, the Court held that the joint hospital/law-enforcement searches were unlawful because they were "designed to obtain evidence of criminal conduct . . . that would be turned over to police and that could be admissible in subsequent criminal prosecutions." *Ferguson*, 532 U.S. at 88, 121 S. Ct. at 1294; *id.* (explaining that, "None of our special needs precedents has sanctioned the routine inclusion of law enforcement, both in the design of the policy and in using arrests, either threatened or real, to implement the system designed for the special needs objectives.") (Kennedy, J. concurring); *id.* at 83 n. 20, 121 S. Ct. at 1291 ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes. Our essential point is

---

Court's holding on the special needs issue. The Supreme Court reversed and remanded for further proceedings on the issue of consent.

the same as JUSTICE KENNEDY's -- the extensive entanglement of law enforcement cannot be justified by reference to legitimate needs") (capitalization in original)); *id.* at 88, 121 S. Ct. at 1294 (explaining that, "The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." (Kennedy, J., concurring)).

The partnership between the school system and the police department materially altered the "special relationship"[10] between school authorities and students and instead has made the school system an "institutional arm of law enforcement" for the purposes of the policy. *See Ferguson*, 532 U.S. 67, 88, 121 S. Ct. 1281, 1294 (2001) (Kennedy, J., concurring). The record supports the conclusion that VBCPS school authorities do have law enforcement responsibilities — they are *required* to notify their law enforcement partners of all suspected student criminality, which necessarily implies their familiarity with criminal laws. *See T.L.O.*, 469 U.S.

---

[10] The Court referenced the special relationship between teachers and students, stating that,

> The special relationship between teacher and student also distinguishes the setting within which schoolchildren operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils.

*T.L.O.*, 469 U.S. at 350, 105 S. Ct. at 747.

at 350 n.1, 105 S. Ct. at 747 (stating that, "Unlike police officers, school authorities have no law enforcement responsibility or indeed any obligation to be familiar with the criminal laws."). For this reason, Mr. Baker bypassed the four security guards on campus and notified Officer Carr of what he described to her as "child pornography," before he even detained O.W, and when he did not even know which, if any, school disciplinary infraction O.W. might have violated. JA950 (Dep. Tr. of Reid Baker, at 16:4-12). There is more than enough evidence in the record for a jury to find that the search was intended to help Officer Carr establish probable cause to arrest O.W. and to gather evidence for his prosecution.

The partnership between the law enforcement and the school system here is eerily similar to the agreement between law enforcement and the hospital in *Ferguson*. Both policies established methods of evidence collection in the special needs setting, included the threat of law enforcement to carry out the program's special needs objective, established parameters for alerting law enforcement of criminality, and outlined arrest procedures. JA371-378 (MOU); *see Ferguson*, at 76, 121 S. Ct. at 1287. What is missing from the written partnership agreement — as true in *Ferguson* — is a clear statement about how the partnership promotes school discipline or order. Given the "extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of 'special needs.'" *Id*. at 69, 121 S. Ct. at 1284.

24

And in *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402 (1989), the Court reserved "for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the [search] program." *Id*. at 621 n.5, 109 S. Ct. at 1415. It would also be reasonable for a jury to infer pretext where, for the last twenty years, school authorities have given police officers all the criminal evidence they needed to arrest and prosecute students.

What is missing from the record is any evidence about any safeguard VBCPS has in place to prevent officers from releasing confidential student records after disclosure or from applying the search program discriminately between students of different races, abilities, and socio-economic backgrounds. *United States v. Curry*, 965 F.3d 313, 320 n.4 (4th Cir. 2020) ("Moreover, special needs cases all involve a critical feature not present here: programmatic safeguards designed to protect against a law enforcement officer's arbitrary use of unfettered discretion.").

The record establishes that Carr was inside the office with every black student involved in the March 5, 2019 investigation, JA574-575 (Carr and Baker were inside the room with the black female student and asking her questions); JA747, JA1023 (Officer Carr was inside the office with K.F., a black male student). Carr was inside

the office with Mr. Baker and O.W. G.C., who was also being detained and questioned about his possession of the photograph, was the only student Baker questioned privately on March 5, 2019. The record also includes an affidavit from another black male student who described a similar experience at a different VBCPS school. JA749.

It is no secret that VBCPS disciplines black male students, such as Appellant O.W., more harshly and refers them to law enforcement more frequently,[11] and it is a matter of common sense that these students would be subject to the joint investigative method more often. But this is not to suggest the joint interrogation and search policy is not harming children of all races, abilities, and genders.

According to the district court, *Ferguson* is inapposite because it involved "the permissibility of suspicionless searches."[12] First, in the special needs context, the degree of the intrusion is balanced against the governmental interest determine

---

[11] *See* Civil Rights Data Collection (ed.gov); s*ee* Virginia Department of Education's Safe Schools Information Report Data Retrieval tool; Gabriella Souza, *Racial Disparities Get Beach Schools Chief's Attention*, THE VIRGINIAN-PILOT (February 19, 2015), available at https://www.pilotonline.com/news/education/article_984bf825-eb58-5c0da46a-eaadc7bed25d.html.

[12] The district court concluded that, "O.W. overlooks a key difference between the cases—*Ferguson* involved the permissibility of suspicionless searches; here there is no allegation that Mr. Baker searched his phone without suspicion. Moreover, O.W.'s contention that school officials must obtain warrants before searching students is highly impractical and lacks legal support." JA216, at 15-16 n. 14.

the level of suspicion required to justify the search.[13] As explained *infra*, the cellular

phone search at issue would most certainly require more justification than the urine

screen at issue in *Ferguson*. Second, in *Ferguson*, the panel of this Court and the

Supreme Court merely assumed, without deciding, the tests were indeed

suspicionless.[14]

The warrantless search was unreasonable because it was intended to gather

evidence of O.W.'s criminality to be used against him in his prosecution.

> 2. *Even if the partnership between police and the school system to jointly investigate students did not invalidate application of the special needs doctrine, the school cellular phone search was unreasonable under T.L.O. v. New Jersey because it was not justified at the inception and the scope of the search is unknown.*

In *T.L.O.*, the Court "applied a standard of reasonable suspicion to determine

the legality of a school administrator's search of a student" and "held that a school

---

[13]    *See Bd. of Educ. v. Earls*, 536 U.S. 822 (2002) (suspicionless drug testing); *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) (suspicionless drug testing for high school athletes); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (suspicionless drug testing of Customs Service positions); *Griffin v. Wisconsin*, 483 U.S. 868 (1987) (probationer home searches upon reasonable grounds); *O'Connor v. Ortega*, 480 U.S. 709 (1987) (workplace searches of public employees); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (traffic stops at border checkpoints).

[14]    "In a footnote to their brief, respondents do argue that the searches were not entirely suspicionless. They do not, however, point to any evidence in the record indicating that any of the nine search criteria was more apt to be caused by cocaine use than by some other factor, such as malnutrition, illness, or indigency. More significantly, their legal argument and the reasoning of the majority panel opinion rest on the premise that the policy would be valid even if the tests were conducted randomly." *Ferguson*, 532 U.S. at 77 n.10, 121 S. Ct. at 1288.

search 'will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction,'" *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 370, 129 S. Ct. 2633, 2639 (2009) (citing *T.L.O.*, at 345, 105 S. Ct. at 733).

In *Safford*, Supreme Court held that the strip search of a student for drugs was unreasonable even though it was done in response to a potentially imminent risk to students' health and safety. There, a student was believed to have been in possession of prescription-strength ibuprofen and over-the-counter naproxen, which the Court acknowledged could have caused "real harm" to students if taken in large doses. *Id.* at 375, 129 S. Ct. at 2642. However, school authorities had "no reason to suspect" there was a threat of harm to students because it had no information that the student had been distributing large doses to students. *Safford*, at 376, 129 S. Ct. at 2642 (explaining that the school official must have been aware of both the "nature [of the offense] and limited threat" to students). For this reason, "the content of the suspicion failed to match the degree of intrusion." *Id.* The Court held that "both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Id.* at 374, 129 S. Ct. at 2641.

**Baker did not have a justified government interest in searching the digital contents of O.W.'s cellular phone**. A cellular phone search requires a more compelling justification than that required to search a student's other personal effects. *Id.*; *see also Riley v. California*, 573 U.S. 373, 394-95, 134 S. Ct. 2473, 2489 (2014). Indeed, even in the context of a criminal arrest, society has more of an expectation of privacy in the digital contents of their cellular phones than in a strip search of their person. *Compare Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326, 132 S. Ct. 1510, 1515 (2012) (finding it reasonable to strip search an arrestee entering a correctional facility), *with Riley v. California*, at 394-95, 134 S. Ct. at 2489 (finding it unreasonable to search an arrestee's cellular phone). Baker therefore required "distinct elements of justification" for searching the digital contents of O.W.'s cellular phone.

Baker, like all school employees, is excluded from the classes of professionals who are authorized by statute to possess and view such sensitive materials for bona-fide work related purposes. *See* § 18.2-374.1:1 (exempting only possession by physicians, psychologists, scientists, attorneys, social workers, law enforcement employees, judges, and law clerks). Rightfully so because a lewd image does not pose an imminent threat to the health or safety of students and is not admissible in any school disciplinary hearing. It is a hard argument to make that Baker's search of O.W.'s cellular phone to find purported child pornography was justified by a

legitimate government purpose where the Congress and the Virginia General Assembly have made it unlawful for him to do so.

According to the district court, the content of Baker's suspicion was that O.W. *possessed* the photograph inside his cellular phone, not that he had been widely distributing the photograph to other students. JA1216-1217. Citing O.W.'s Second Amended Complaint, the district court concluded that "Mr. Baker limited the search to the photo gallery and did not otherwise search the phone." JA1217. O.W.'s allegation in his pleading that Baker searched the gallery of the phone does not, in itself, support the inference that Baker *only* searched the photo gallery. The record does contain any admissible evidence regarding the scope of the search. It does not show whether Baker searched O.W.'s social media accounts, his internet search history, his various applications, or his iCloud storage data, and it does not reflect the extent to which the photo gallery was searched.

Further, assuming the district court's inference is proper, unlike the threat of danger associated with weapons or drugs, the mere existence of a photograph stored inside of a photo gallery would prove O.W.'s possession and nothing more. The search occurred at the end of the school day or after school hours, after Baker had already permanently dispossessed O.W. of the phone. The uncontradicted evidence shows that Baker placed the phone in airplane mode and powered it down such that any evidence inside the photo gallery could not have been tampered with

or remotely wiped. *Riley*, at 390, 134 S. Ct. at 2487 ("In any event, as to remote wiping, law enforcement is not without specific means to address the threat. Remote wiping can be fully prevented by disconnecting a phone from the network.").

Contrary to the district court's assessment, if Baker only searched the photo gallery of the phone, a reasonable jury would conclude that he only did so for criminal evidentiary purposes — to help Carr develop probable cause to arrest O.W. and to gather proof of his guilt beyond a reasonable doubt, and this need to urgently gather criminal evidence from O.W. while he was still in the school's care is not a justifiable government interest.

## B.    THE DISTRICT COURT ERRED IN HOLDING THAT O.W.'S CONFESSIONS WERE VOLUNTARY.

"The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, **however slight**, [or] by the exertion of **any improper influence**." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (quoting *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202 (1976) (alterations in original) (emphasis added)). According to the district court, "O.W. admitted that he had shown the photograph to other students before any alleged coercion began." JA1221. However, it is highly unlikely for any jury to believe that the Appellees only started to coerce O.W.'s confession after obtaining his full confession.

31

Evidence compelled by a government actor violates the Fifth Amendment in any setting, permitting the elicitation provokes a person "to give an answer which **discloses a fact** that would form a necessary and essential part of a crime which is punishable by the laws." *United States v. Burr*, 25 F. Cas. 38, 40 (emphasis added); *Ullmann v. United States*, 350 U.S. 422, 438-39, 76 S. Ct. 497, 507 (1956) ("also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of 'penalties affixed to the criminal acts'"). Thus, assuming O.W.'s first admission to having shown the photograph was voluntary, that would not suggest that his later confessions regarding the identity of the person depicted in the photograph, or its contents were also. Cf. *Lyons v. Oklahoma*, 322 U.S. 596, 598, 64 S. Ct. 1208, 1210 (1944).

There is sufficient evidence in the record for a jury to find that Baker, the person in charge of then-thirteen-year-old O.W., applied coercive pressures to extract his oral and written confessions. *See Couch v. United States*, 409 U.S. 322, 329, 93 S. Ct. 611, 616 (1973); *Johnson v. United States*, 228 U.S. 457, 459, 33 S. Ct. 572 (1913). This kind of pressure applied to a thirteen-year-old child who did not have the benefit of a parent, or his attorney present is the kind of tactic the Supreme Court has consistently held so reasonably calculated to inspire fear that any resultant confession must be regarded as compulsory. *E.g.*, *Haley v. Ohio*, 332 U.S.

596, 600, 68 S. Ct. 302, 304 (1948); *Chambers v. Florida*, 309 U.S. 227, 230, 60 S. Ct. 472, 474 (1940).

Further, in this context, the Supreme Court has repeatedly rejected criminal interrogations conducted through third party friendly faces. *See*, *e.g*., *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) (holding post-indictment confession violative of the Sixth Amendment where elicited by police informant); *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *see also Commonwealth v. Gatewood*, No. 1420-12-1, 2013 Va. App. LEXIS 27, at *16-17 (Ct. App. Jan. 22, 2013) (unpublished) (for treatment in Virginia courts) (holding confessions obtained in violation of Fifth and Sixth Amendments where elicited by a social services employee for criminal investigative purposes).

The district court expressed some concern with the VBCPS/VBPD's joint investigative practice, but it nonetheless concluded that O.W.'s confessions were voluntary. JA1221, at n.20 ("While the Court concludes that O.W.'s statements were voluntary, it does not condone the investigatory techniques practiced by the City and the School Board."). In so doing, the district court resolved the facts against O.W. to resolve a motion for summary judgment against him.

At a minimum, the record establishes genuine disputes of material fact regarding whether O.W was compelled to admit facts regarding the (1) identity of

the person depicted in the photograph, (2) the contents of the photograph, and (3)

identity of the person who texted the photograph to G.C.

The district court further stated that,

The questioning was conducted by a school official in a familiar
setting—the school guidance office—and the entire incident occurred
over the course of an afternoon." Although certain facts—O.W.'s age,
that he was alone, Officer Carr's presence, and Mr. Baker's admonition
about violating the Student Code of Conduct— may have influenced
O.W., they are not enough, without more, to suggest O.W.'s will was
overborne.

But on a motion for summary judgment, the question for the court was not

whether it *believed* O.W.'s confessions were coerced, which is a question of fact.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2048 (1973) (noting

that the question of whether waiver was "in fact 'voluntary' or was the product of

duress or coercion, express or implied, is a question of fact to be determined from

the totality of all the circumstances."). The questions for the court to decide were

whether the facts were so one sided as to constitute coercion as a matter of law or

whether O.W. failed to present *any* evidence of coercion such that summary

judgment should have been granted to the Appellees. The district court erred when

it weighed the evidence against O.W. and awarded summary judgment to the

Appellees.

C.      THE DISTRICT COURT ERRED IN HOLDING THAT O.W. FAILED
        TO PROVIDE EVIDENCE THAT THE DEFENDANTS ACTED
        JOINTLY IN CONCERT FOR THE § 1983 CONSPIRACY CLAIM.

"To establish a civil conspiracy under § 1983, Appellants must present
evidence that the Appellees acted jointly in concert and that some overt act was done
in furtherance of the conspiracy which resulted in Appellants' deprivation of a
constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).
Citing *Hinkle*, the district court said that, "While O.W. is not required to come
forward with direct evidence, he has a 'weighty burden' and must show "specific
circumstantial evidence that each member of the alleged conspiracy shared the same
conspiratorial objective." JA1223 (quoting *Hinkle*, 81 F.3d at 421). But the district
court misapplied the rule; O.W. had a much lighter burden to support the element of
concerted conduct with direct evidence.

The district court appears to have treated conspiratorial intent as an additional
element of a prima facie § 1983 claim. The district court overlooked the fact that
*Hinkle* is a circumstantial evidence case where the plaintiffs had no direct evidence
that the government defendants acted jointly in concert to deny them access to the
court. It was only due to their failure to "come forward with direct evidence" that
that they were required to show circumstantial evidence of conspiratorial intent.

> Appellants did not produce any evidence, either direct or
> circumstantial, that Appellees acted ***in concert*** to obstruct Appellants'
> access to the courts. Appellants' evidence did not disclose any
> communication between Officer Walker, Officer Lake, Dr. Saoud, Dr.

> Frost or others that might give rise to an inference of an agreement to commit any acts, wrongful, or otherwise. Nor does Appellants' evidence give rise to an inference that each alleged conspirator shared the same conspiratorial objective.

*Hinkle*, 81 F.3d at 421-22 (emphasis added).

O.W. was not required to present circumstantial evidence of "conspiratorial intent" where the record teeming with direct evidence of concerted conduct. For example, in *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992), this Court held that a plaintiff established his § 1983 conspiracy claim with testimonial evidence that a defendant sat on plaintiff's legs while other officers inflicted excessive force. There, on direct examination, the officer "acknowledged that he sat on [plaintiff's] legs to bring him under control." *Id*. For this reason, this Court concluded that "a factfinder could reasonably conclude that [defendant] acted in concerted activity with [the police officers]," and the plaintiff was not required to show additional circumstantial evidence of conspiratorial intent.

The question for the court to decide was whether the Appellees acted jointly in concert in the *act* that resulted in the constitutional deprivation, not whether they shared the intent to deprive O.W. of his rights. *See*, *id*. Officer Carr and Mr. Baker participated in the acts of detaining, interrogating, and searching O.W. in a coercive setting, and they did so in a manner to avoid all the impediments of knowing waiver.

36

If at all necessary, the record establishes that this joint criminal investigative method has been employed by VBCPS and VBPD employees for at least nineteen years. It would be more than reasonable for a jury to infer that a "long course of conduct" — nineteen years of joint investigations leading to arrests and prosecutions — "executed in the same way" is proof of a tacit understanding. *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S. Ct. 1265, 1270 (1943).

The evidence undoubtedly establishes the Appellees were acting pursuant to their common plan. The district court therefore erred when it refused to consider the constitutional claims underlying the conspiracy claim and for denying O.W. his right to have his claims decided by a jury.

### D.   THE DISTRICT COURT ERRED IN HOLDING THAT O.W. FAILED TO ESTABLISH HIS CLAIMS UNDER MONELL.

The district court refused to consider O.W.'s *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 664, 98 S. Ct. 2018, 2022 (1978), claims against the City of Virginia Beach and the School Board of the City of Virginia Beach because it held that O.W. failed to bring forward evidence of a requisite constitutional violation. For all the foregoing reasons, the record is sufficient to allow a reasonable jury to infer the Appellees violated O.W.'s constitutional rights. With reasonable inferences afforded to O.W., the practice of conducting planned joint criminal investigations, led by school officials, the jury would likely infer that the Appellees are engaged in a practice that flows from the top downward, or, considering O.W.'s proof of the long-

standing nature of the policies and customs, unlawful acts that are so persistent and widespread that they constitute standard operating procedures.

E. THE DISTRICT COURT ERRED IN HOLDING THAT THE SCHOOL BOARD DID NOT VIOLATE O.W.'S RIGHT TO DUE PROCESS BY PROMULGATING AND FAILING TO ENFORCE A REGULATION THAT REQUIRED IT TO PROTECT HIS CONSTITUTIONAL RIGHTS.

**School Board Regulation 5-64.1 Established a Duty for the School Board to Protect O.W.'s Constitutional Rights and a Special Relationship**. The vast majority of the Circuit Courts, including this Court, have interpreted the Court's holding in *Deshaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 201-02, 109 (1989), to affirm the principle that state actors, including school officials, have no general constitutional duty to protect the public at large. However, the Court has recognized two exceptions to the general rule: a state actor will owe an affirmative duty to protect a person where (1) there exists a special relationship between the government and the citizen, and (2) the state creates the danger that results in injury.

It is beyond debate that students do not automatically enjoy a special relationship with a school authority by virtue of his compulsory attendance at school, alone. But this is not O.W.'s argument. Under Virginia law, the School Board has a duty to properly explain, enforce, and observe its own laws. Virginia Code § 22.1-79 ("A school board shall: See that the school laws are properly explained, enforced and observed . . ."). Virginia Beach School Board regulation 5-64.1, which comes

under the heading "law enforcement," establishes, "The School Board shall protect the constitutional rights of minor students entrusted to its care . . . ." V.B. S.B. Reg. 5-64.1.

The district court reasoned that "*DeShaney* made clear that the special relationship arose not 'from [the State's] expressions of intent to help . . . but from the limitation which it has imposed on his freedom to act on his own behalf.'" JA1227 (quoting *Deshaney* 489 U.S. at 200). "The Fourth Circuit has described this limitation on freedom as 'incarceration, institutionalization, or the like.'" (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995).

The search at issue cannot be said to have arisen from O.W.'s compulsory school attendance. It is undisputed that Baker held O.W. after school hours for Officer Carr when he found out that Carr was not doing a "paper arrest," and Officer Carr further searched O.W.'s cellular phone after this time. JA509, JA995, JA1351. This case therefore involves a restraint of liberty outside compulsory school attendance.

Further, under state tort law, Appellees were negligent in their failure to protect O.W.'s rights, and the degree of such negligence is a question for the jury. *Wright v. Swain*, 168 Va. 315, 318, 191 S.E. 611, 612 (1937).

**O.W. had a Liberty Interest and Substantive Entitlement in the Regulation and its Enforcement**. In *Deshaney*, the Supreme Court never

reached the question of whether a state law establishing a limited right of protection to a class of persons created "an entitlement which . . . enjoy[ed] due process protection against state deprivation"[15] under *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), because the appellant belatedly raised the claim for the first time in his appeal to the Supreme Court, *Deshaney*, at 195 n.2.[16] In *Bd. of Regents*, the Court explained that a person may have a property interest "stem[ming] from an independent source such as state law," in a benefit where he has "a legitimate claim of entitlement to it" and relies on it in his daily life. "It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." It is not only unfair, but it is unreasonable to even suggest that a school system may constitutionally engender the trust of students and parents by holding itself out as a shield of protection standing between students and law enforcement but may abandon this duty as soon as the bell rings. O.W. was owed protection under the regulation — a liberty

---

[15]   O.W. alleged that the School Appellees deprived him of "fairness and adequacy in the procedures employed by the government to deprive Plaintiff of his liberty and property, and against arbitrary impairments of his substantive rights and entitlements, under the Due Process Clause of the Fourteenth Amendment." JA1214, at n.12). The district court believed that it could not discern a short and plain statement of relief for this claim.

[16] Stating, "this argument is made for the first time in petitioners' brief to this Court: it was not pleaded in the complaint, argued to the Court of Appeals as a ground for reversing the District Court, or raised in the petition for certiorari. We therefore decline to consider it here." *Deshaney*, 489 U.S. 189, 195 n.2.

interest — he had a right to a pre-deprivation hearing and the right not to have his "reliance [on the regulation] . . . arbitrarily undermined." *Id*. The Appellees never addressed this argument in their motion to dismiss or motion for summary judgment, and the district court was wrong to award summary judgment in the Appellees' favor on this claim.

F.    THE DISTRICT COURT ERRED IN TAKING JUDICIAL NOTICE OF UNAUTHENTICATED, NON-PUBLIC RECORDS.

District courts are authorized to take judicial notice of adjudicative facts in two circumstances, and those are where facts are "(1) generally known within the trial court's territorial jurisdiction," or "(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201. First, the district court improperly noticed unauthenticated records. *Powers v. Dole*, 782 F.2d 689, 694 n.2 (7th Cir. 1986) (stating that, "Judicial notice of an unauthenticated government record is improper.").

Second, in Virginia, juvenile records are confidential, non-public records, which are not "generally known within the trial court's territorial jurisdiction," and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." See Virginia Code § 16.1-305. The district court therefore erred in taking judicial notice of facts contained in unauthenticated records.

G.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING APPELLANT LEAVE TO AMEND HIS PLEADING AND FOR LIMITING THE EXTENT TO WHICH HE MAY SEEK LEAVE TO AMEND.

Appellant appeals the district court's denial of his motion for leave to amend and its limitation on the extent to which Appellant may seek leave to amend in the future. This Court reviews "a district court's decision to grant or deny a party leave to amend for an abuse of discretion.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999).

"Federal Rule of Civil Procedure 15(a)(2) directs courts to 'freely give leave when justice so requires.'" *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 879-80 (4th Cir. 2020). "Motions for leave to amend should generally be granted in light of this Court's policy to liberally allow amendment." *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018) (internal quotation marks omitted). "Rule 15(a) requires that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Hart v. Hanover Cty. Sch. Bd.*, 495 F. App'x 314, 315 (4th Cir. 2012) (unpublished).

The district court denied without prejudice O.W.'s motion for leave to amend to file a third amended complaint because of "the substantial changes O.W. propose[d] in his Third Amended Complaint." The district court did not find that Appellant's amendment resulted from his undue delay, bad faith, dilatory motive,

42

repeated failure to cure deficiencies by amendments, or futility. The court further limited the extent to which O.W. could seek leave in the future, warned O.W. that it would review any future motion for leave to amend "critically," and instructed the Appellees to "be sure to adequately consider whether any proposed amended complaint filed by O.W. would be futile." JA1232.

On the other hand, the district court granted the City Appellees' motion for leave to amend their answer, including paragraph five, which challenged the district court's subject matter jurisdiction under the *Rooker-Feldman* doctrine and paragraph one of their affirmative defenses to include the *Rooker-Feldman* doctrine and collateral estoppel, after having already decided that Appellant's claims were not precluded by either doctrine. The district court also granted the City Appellees' motion to amend paragraph sixteen of their answer which originally admitted that Officer Carr was the "trial witness who laid the foundation for the admission of inculpatory statements and other unlawfully obtained evidence against Plaintiff" to an outright denial of the same, after the close of discovery. Appellant would be remiss if he failed to acknowledge these substantial changes, which are all futile after summary judgment.

The court granted O.W. thirty days to file a renewed motion for leave to amend but limited the grounds upon which O.W. could do so. The district court concluded that the liberal pleading standard "should be construed, administered, and

employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." JA1232. However, not one of O.W.'s proposed changes would have required additional discovery.

O.W. did not miss one deadline in the proceedings in the district court, discovery or otherwise. This is to be compared to the Appellees who all failed to file a timely answer as required by the court's scheduling order, JA12, ECF NO. 66, and the School Appellees who failed to file timely discovery responses. JA13, ECF No. 77.

District courts indeed have a complex task in managing the many cases on their dockets, especially on the "rocket docket."  But it cannot be ignored that about eight months elapsed between the date Appellees filed their first motions to dismiss in April 2021 and the date of the district court's ruling on those motions in December 2021. ECF Nos. 4, 8, 28. An additional six months elapsed from the filing of the last motion for summary judgment and the final order. ECF Nos. 122, 151. Appellant cannot bear all the burdens of ensuring the "just, speedy, and inexpensive" determination of these proceedings and should be granted leave to amend his complaint, as necessary, on remand.

H.     THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT "WITH PREJUDICE."

Without finding any prejudice to the Appellees, the district court denied O.W.'s motion for partial summary judgment "with prejudice." *See United States v.*

*Goodson*, 204 F.3d 508 (4th Cir. 2000) (discussing the prejudice ruling in the criminal context). The authority of the district court to grant or deny a motion for summary judgment is expressed in Fed. R. Civ. P. 56. Rule 56 does not provide for a denial "with prejudice." *See Andes v. Vesant Corp.*, 788 F.2d 1033, 1037 (4th Cir. 1986) (stating that an order dismissing a plaintiff's claim under Fed. R. Civ. 41(b) would constitute an abuse of discretion where not authorized by the rule). The district court therefore abused its discretion by denying Appellant's motion for partial summary judgment with prejudice.

## CONCLUSION

For the reasons set forth above, O.W. respectfully submits that the district court's Order of February 14, 2023 (ECF No. 150, 151) should be reversed, and that O.W. be entitled to a jury trial on the merits of the above-referenced claims. The Court should further remand the case with instructions consistent with its judgment and grant Appellant O.W. all relief it deems just and appropriate.

## REQUEST FOR ORAL ARGUMENT

O.W. respectfully requests that this Court hear oral argument in this case. This appeal raises serious Constitutional issues regarding the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Respectfully Submitted,

O.W., a minor by his next friend and parent Santrayia Bass,

By:    /s/_____
        Makiba Gaines, Esq.
        Virginia State Bar No. 93983
        POLARIS LAW FIRM, P.L.L.C.
        2832 South Lynnhaven Road, Suite 201
        Virginia Beach, Virginia 23452
        Phone: (757) 904-0370
        Facsimile: (757) 866-5744
        mg@legalhep757.com
        *Counsel for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

In accordance with Rules 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned counsel for appellant certifies that the accompanying brief is printed in 14 point typeface, with serifs, and, including footnotes, contains no more than 13,000 words. According to the word-processing system used to prepare the brief, Microsoft Word, it contains 11,327 words.

By:    /s/_____

Makiba Gaines, Esq.